UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON


CIVIL ACTION NO.  10-96- KSF

ALLEN KING and BRUCE KING, as
Administrators of the Estate of Roger King                                    PLAINTIFFS


VS.                                    OPINION & ORDER


ERIC TAYLOR, in his individual capacity
as a Kentucky State Trooper                                    DEFENDANT

* * * * * * * * * * *

This matter is before the Court upon the motion filed by the Defendant, Kentucky State

Police ("KSP") Trooper Eric Taylor ("Trooper Taylor"), in his individual capacity, for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [DE #31].  This matter is fully

briefed and ripe for review.

This case arises out of an encounter between Roger King ("King") and various police

officers, including Trooper Taylor, on November 25, 2009 in Boyle County, Kentucky, that ended

in the fatal shooting of King.  The Plaintiffs, Allen King and Bruce King, as Administrators of the

Estate of Roger King ("Plaintiffs"), filed this civil action pursuant to 42 U.S.C. § 1983, alleging

various claims against Trooper Taylor, in both his individual and official capacities, as well as

against the Commonwealth of Kentucky d/b/a Kentucky State Police.  Plaintiffs previously

voluntarily dismissed their claims against the Commonwealth and Trooper Taylor in his official

capacity [DE #9]. Thus, Plaintiffs' claims remain pending only against Trooper Taylor in his individual capacity.

Currently before the Court is Trooper Taylor's motion for summary judgment on Plaintiffs' federal claims for violations of King's constitutional rights and state law claims for wrongful death. In his motion, Trooper Taylor argues that he is entitled to qualified immunity on Plaintiffs' federal claims and is entitled to judgment on Plaintiffs' state law claims pursuant to KRS § 503.085, the doctrine of qualified official immunity, and because King's own criminal conduct was a superseding cause of King's death.

## I.    Factual Background

On November 25, 2009, the Boyle County Sheriff's office received an emergency protective order (EPO) filed by Linda Deskins against King and an arrest warrant for King on charges of Wanton Endangerment in the 1st Degree (Class D Felony), Terroristic Threatening (Class A Misdemeanor), and Burglary 1st Degree (Class B Felony). The EPO and arrest warrant stated that King had unlawfully entered Deskins' property without permission, attempted to fight with her brother, pointed a gun at Deskins' face and said "I'm going to kill somebody today."

The task of serving the EPO and arrest warrant on King was assigned to Sheriff's Deputies Jody Adams and Al Isaacs. Deputies Adams and Isaacs spoke with then Sheriff Lee Roy Hardin regarding the EPO and arrest warrant. Sheriff Hardin warned Deputies Adams and Isaacs that King was violent toward law enforcement and that he had seen King the previous week and King seemed to be acting strange and violent toward him. The Deputies were directed to contact the Kentucky State Police for assistance in serving the EPO and arrest warrant. The Deputies were also informed of a previous altercation between King and the Kentucky State Police in which King fired shots at

a State Trooper. In addition, Chief Deputy James Wilcher told Deputy Isaacs that he had worked with King for several years at the railroad, that King was violent and owned firearms, and recommended that Deputy Isaacs take someone with him if he went to King's house because when King was drinking, he was capable of just about anything. Deputy Isaacs interpreted this to mean that the Deputies would be going into a very hostile environment.

As directed, Deputy Adams contacted the Kentucky State Police Post 7 dispatch and requested assistance in serving the EPO and arrest warrant on King. Deputy Isaacs also directly contacted Trooper Frank Thornberry, with whom he had previously worked, and informed him that they would be needing assistance from the Kentucky State Police. The Deputies were both put in touch with Trooper Taylor, who was available to assist.

Trooper Thornberry called Trooper Taylor to tell him that the Boyle County Sheriff's Office would be needing his assistance in serving an EPO and arrest warrant. He further told Trooper Taylor about the prior incident between King and the Kentucky State Police in which King had fired shots. Trooper Taylor was subsequently contacted by dispatch and told that he would need to go to Boyle County to help the Sheriff's Office serve a warrant on King. Trooper Taylor told dispatch that Trooper Thornberry had informed him of the previous incident between King and the State Police.

Trooper Taylor then met Deputies Adams, Isaacs, Mike Marshall, Gregg Coffman and Dustin Clem at the Boyle County Sheriff's Office at approximately 6:30 p.m. to discuss and coordinate how King would be served. Deputy Isaacs explained to Trooper Taylor that the allegations in the EPO indicated that persons were in fear for their safety and that he felt the EPO and arrest warrant should be served on King as soon as possible. Deputy Isaacs also told Trooper Taylor it was alleged that King threatened to kill someone. The group also discussed the prior incident between King and the

Kentucky State Police in which shots were fired by King. According to Deputy Adams, the group felt that they would be going into a hostile environment, given their knowledge that there had been hostility toward law enforcement in the past.

The group reviewed a map of King's property and developed a general plan to effect service. They planned to approach the house by driving their vehicles with no sirens, strategically place the marked vehicles in front of the house, and illuminate the house with the headlights and spotlights to announce the presence of law enforcement. Deputy Adams would then knock on the front door and serve the EPO and warrant while the other officers, including Trooper Taylor, provided armed cover.

After a brief delay to allow Deputy Isaacs to respond to an unrelated call for assistance, the officers departed for King's property. The officers arrived at King's residence at approximately 9:00 p.m. Following their plan, the officers proceeded up King's driveway and parked their vehicles at various positions around the house. All officers then turned on their headlights, bar lights and spotlights and aimed toward the front of the house to announce the presence of law enforcement. Deputy Adams approached the front door, knocked loudly and announced that he was a Boyle County Sheriff's deputy. While Deputy Adams approached the front door, the other officers provided cover from behind their vehicles.

King did not answer the front door. Deputy Adams then proceeded to the left of the house to a car port with another entrance, while Deputy Isaacs followed. Deputy Adams again knocked on the door and announced he was with the Sheriff's Department, but there was no response. Deputy Isaacs decided to go to the back of the house to investigate, followed by Trooper Taylor providing cover. The officers rounded the corner of the house and continued on to a wooden back porch to the

rear of King's residence. From the back of the house, Deputy Isaacs heard noise that sounded like two people talking. There was a set of double-paned glass doors at the top of the porch that provided a line of sight to the interior of the house. Deputy Isaacs looked through the glass and saw a man he assumed was King lying down on a couch with a blanket partially covering him. Deputy Isaacs came away from the doors and motioned to Trooper Taylor. He told Trooper Taylor that he had seen King and that he was going to drop all of his weapons so that King would not perceive a threat and asked Trooper Taylor to provide cover for his safety. Deputy Isaacs approached the doors and moved to the left door, leaving Trooper Taylor to cover him using his line of sight through the right door.

Deputy Isaacs pressed his shoulder against the door pane so that his reflective Boyle County Sheriff's Office patch would be visible through the glass. Deputy Isaacs began knocking loudly on the door and yelling that he was with the Sheriff's department as he further illuminated the interior of the home with his hand-held flashlight. At some point, Deputy Adams joined Deputy Isaacs and Trooper Taylor and took a position between the officers at the center of the doors. Deputy Adams then turned his body so his Boyle County Sheriff's Office patch was turned toward the doors and also knocked on the door, identified the officers as law enforcement and yelled for King to come to the door, calling King by name. In the residence, the television set was on, illuminating the room. Trooper Taylor remained to the right of the deputies, providing cover with his M-16 rifle held at the low ready, or down at a 45-degree angle with no finger placed on the rifle trigger, keeping his eyes focused on King's hands to maintain awareness of any potential threat that King might pose.

The parties dispute what happened next. According to the officers' testimony, the officers then saw King turn toward them, rise to a seated position and look directly at them with an angry

expression.  King then turned away from the officers, reaching across his body with his right hand toward his left side.  King retrieved a large, fully-loaded firearm, a Taurus Judge revolver, from his left side and turned toward the officers, pointing his weapon at them.  Trooper Taylor responsively fired his M-16.  The M-16 bullet perforated the double-paned glass, shattering the glass so that visibility was completely obscured but remained in the door frame.

Plaintiffs dispute the officers' version of the events.  Plaintiffs do not contest that King had a gun with him on the couch.  Rather, Plaintiffs argue that, viewing the evidence in the light most favorable to Plaintiffs, "Taylor shot King while lying on his couch from his back porch and King was not extending a gun in the officers [sic] direction and his face was toward the end of the couch or in the direction of the TV."  Plaintiffs further speculate that King may have been sleeping when he was shot.

Regardless of the circumstances of the shooting, once the shot was fired, all three officers fled the porch for cover, unsure of who had fired the shot, whether an officer was struck or whether King was struck.  After initially dispersing, Trooper Taylor ran to the front of the house to his cruiser, where he met Deputy Isaacs.  Trooper Taylor was uncertain whether King had fired a shot and checked Deputy Isaacs' person to make sure he was uninjured.  At that time, Deputy Isaacs believed that King had fired his weapon.  Trooper Taylor stated that he had fired a shot into the house.  The men smelled the chamber of Trooper Taylor's M-16 and determined that he had fired a shot.  Trooper Taylor called his post to inform them of the shooting.  Trooper Taylor pulled his cruiser around the house to provide cover and used his speaker system to attempt to make contact with King and ask him whether he required medical assistance.  Trooper Taylor was unable to make visual contact with King, as the glass was shattered but intact inside the frame of the porch doors.

The Kentucky State Police Special Response Team was summoned to the scene and it was subsequently determined that King had died from a gunshot wound.

## II.    Procedural History

Plaintiffs filed this action against the KSP and Trooper Taylor in both his individual and official capacities on or around March 25, 2010.  Plaintiffs' Complaint was brought pursuant to 42 U.S.C. § 1983 and brings claims for unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution (Count I), assault and battery (Count II), negligence and vicarious liability (Count III), failure to train (Count IV) and includes a request for punitive damages (Count V).  With respect to their constitutional claims, Plaintiffs specifically allege that Trooper Taylor's shooting and killing of King constitutes an unreasonable seizure and that Trooper Taylor's position at King's back door constitutes an unreasonable search.

Although Trooper Taylor was named as a defendant in both his individual and official capacities, only one summons was issued.  [DE #5].  However, the summons issued to Trooper Taylor was not issued directly to Trooper Taylor, but was instead directed to "Kentucky State Trooper Eric Taylor, c/o Morgain Sprague, Kentucky State Police Legal Counsel, 919 Versailles Road, Frankfort, KY 40601."

Regardless, on or around April 19, 2010, Trooper Taylor, in his official capacity, moved to dismiss the Complaint on grounds of immunity. [DE #6].  Also on April 19, 2010, Trooper Taylor, in his individual capacity, filed an Answer to the Complaint, asserting "insufficient service of process" as an affirmative defense. [DE #7].  The parties subsequently agreed to dismiss Plaintiffs' claims against the Commonwealth and against Trooper Taylor in his official capacity.  Thus, the only claims that remain pending are those against Trooper Taylor in his individual capacity.

In support of his motion for summary judgment, Trooper Taylor first argues that Plaintiffs' Complaint against him must be dismissed for insufficient service of process. Should the Court determine that Trooper Taylor waived this defense, Trooper Taylor further argues that he is entitled to qualified immunity on Plaintiffs' federal and state claims and is further entitled to judgment as a matter of law on Plaintiffs' state law wrongful death claim pursuant to KRS § 503.050 and Kentucky tort law. In response, Plaintiffs argue that Trooper Taylor has waived the ability to raise insufficient service of process as a defense through his extensive participation in the litigation of this case. Plaintiffs further argue that they have raised genuine issues of material fact regarding whether Trooper Taylor is entitled to qualified immunity from their claims.

### III.  Analysis

#### A.  Whether Trooper Taylor has Waived Service

Trooper Taylor first argues that the Court need not reach the merits of this case because the Complaint should be dismissed against him for insufficient service of process. Absent waiver, Rule 4 of the Federal Rules of Civil Procedure requires personal service of a summons and a copy of the complaint upon each individual defendant. Fed. R. Civ. Pro. 4. "Without such personal service, a district court is without jurisdiction to render judgment against the defendant." *The Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 116 (6th Cir. 1988). *See also Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999)("In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as a defendant."). Thus, "the requirement of proper service of process 'is not some mindless technicality.'" *Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991)(quoting *Del Raine v. Carlson*, 826 F.2d 698, 704 (7th Cir. 1987)).

Under Rule 4(e), in this case pending in a federal court located in Kentucky, service may be made by following Kentucky law for serving a summons brought in courts of general jurisdiction in Kentucky; delivering a copy of the summons and of the complaint to the individual defendant personally; leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or delivering a copy of each to an agent authorized by appointment or by law to receive service of process. Fed. R. Civ. Pro. 4(e).

In this case, although Trooper Taylor was named in both his individual and official capacities, only one summons was issued. This summons was addressed to Trooper Taylor, in care of Morgain Sprague, an attorney employed by the Department of State Police and co-counsel for Defendants in this action. [DE #5]. Plaintiffs did not seek an agreement from Trooper Taylor or Ms. Sprague for service of process in this manner and Ms. Sprague is not an agent authorized to receive service of process on behalf of Trooper Taylor.

Plaintiffs do not deny that there was no explicit agreement for Ms. Sprague to accept service on Trooper Taylor's behalf. However, Plaintiffs explain that "[i]t appears likely that KSP counsel's office was contacted concerning where to send the amended summons [directed to Trooper Taylor], and Sprague's name was provided" and that "someone within KSP must have provided Sprague's name." Plaintiffs' difficulty explaining the reasons for their own counsel's actions is unsatisfactory. Plaintiffs further state that, although the summons was sent restricted mail and should have been signed for on behalf of the addressees only, the green signature card that was returned was signed by an individual named Ron Swizer. Again, this fact is not helpful to Plaintiffs because, in Kentucky, although service may be made by certified mail, the certified mail must be signed for and accepted by the defendant. *See Colebrook v. Kentucky Dept. of Motor Vehicle Enforcement*, 2010

WL 4979072 at *3 (E.D.Ky., Dec. 2, 2010). In addition, the Court notes that no executed summons was returned to the Court and there is otherwise no proof of service in the record as required by Fed. R. Civ. Pro. 4(l). Regardless, Plaintiffs concede that there was no agreement for Ms. Sprague, or anyone else at the KSP for that matter, to accept service on Trooper Taylor's behalf. Even if service on the KSP was sufficient to effect service on Trooper Taylor in his official capacity, it cannot suffice to bring him before the court in his individual capacity. *Ecclesiastical Order of the Ism of Am, Inc.*, 845 F.2d at 116. The fact that Trooper Taylor may have had actual notice of the suit is immaterial. *Id*. *See also Harris v. City of Cleveland*, 7 Fed.Appx. 452, 456 (6th Cir., March 26, 2001)(unpublished). Thus, service of process on Trooper Taylor was unquestionably defective in this case.

Despite the faulty summons, on April 19, 2010, Trooper Taylor made his first appearances in this case in both his official and individual capacities. In his official capacity, he moved to dismiss the case based on immunity. [DE #6]. In his individual capacity, he filed an Answer, asserting insufficient service of process as an affirmative defense. [DE #7]. Plaintiffs first argue that Trooper Taylor waived his ability to rely on the insufficient service of process defense because he asserted it in a "boilerplate fashion" in his Answer with fifteen other defenses and that he "did nothing in his answer, or subsequently, to alert the Court or Plaintiff's counsel that his ninth defense was anything more than the bromide contained in just about every answer filed in this Court." Under Rule 12 of the Federal Rules of Civil Procedure, a party waives the defense of insufficient service of process by either omitting it from a motion made under Rule 12 or failing to include the defense

in its responsive pleading.  Fed. R. Civ. P. 12(b)(5), (g)(2) and (h)(1).[1]  Either way, a defendant has

the option of objecting to defective service by either filing a motion to dismiss or asserting it as an

affirmative defense in an answer.  *See Federal Nat. Mortg. Ass'n v. Cobb*, 738 F.Supp. 1220, 1226

(N.D. Ind. 1990)("A defendant may forgo a motion and assert in answer to the complaint every

---

[1]With respect to the proper presentation of defenses, Rule 12 of the Federal Rules of Civil Procedure provides, in part, as follows:

(b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party *may* assert the following defenses by motion:
...
     (5) insufficient service of process;
...
A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.
...
(g) Joining Motions.
     (1) Right to Join.  A motion under this rule may be joined with any other motion allowed by this rule.
     (2) Limitation on Further Motions.  Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.
(h) Waiving and Preserving Certain Defenses.
     (1) When Some Are Waived. A party waives any defense listed in Rule 12(b)(2)-(5) by:
     (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or
     (B) failing to either:
          (I) make it by motion under this rule; or
          (ii) *include it in a responsive pleading* or in an amendment allowed by Rule 15(a)(1) as a matter of course.

Fed. R. Civ. Pro. 12 (emphasis added).

defense, objection, or response the defendant has to the plaintiff's claim for relief, including jurisdictional challenges, denials, affirmative defenses, and counterclaims."). Thus, Trooper Taylor properly preserved the defense by raising it in his Answer.

Although Plaintiffs argue that Trooper Taylor had an obligation to go beyond merely asserting this defense in his Answer and was instead required to specifically point out how Plaintiffs failed to satisfy the service provisions of the Federal Rules, they cite to no Sixth Circuit cases imposing such a requirement. Rather, in order to preserve the defense of insufficiency of service of process, Rule 12 requires only that the defense be presented in either the defendant's responsive pleading, as it was in this case, or a Rule 12(b) motion to dismiss.

Plaintiffs further suggest that Trooper Taylor "arguably waived the defense when his counsel entered a general appearance on behalf of all the defendants and brought a motion to dismiss and failed to raise service of process." It is true that, in this case, Trooper Taylor filed both a motion to dismiss and an Answer. Typically, under Rule 12(h), filing a motion to dismiss that does not raise the issue of defective service waives the defense. However, in this case, Trooper Taylor has been sued in two separate and distinct capacities - his official capacity as a governmental official and his individual capacity. As explained by the United States Supreme Court in *Kentucky v. Graham*, 473 U.S. 159 (1985):

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity.

> *Id*. at 165-166 (citations omitted)(emphasis in original).

Thus, as in *Colebrook*, the argument that a motion to dismiss filed in Trooper Taylor's official capacity somehow waives his ability to raise the defense of insufficient service of process in an answer filed in his individual capacity is misplaced. 2010 WL 4979072 at *3. Here, Trooper Taylor's first appearance in his individual capacity was through his Answer, which, as noted above, adequately preserved the affirmative defense of insufficient service.

However, also similar to *Colebrook*, Plaintiffs argue that Trooper Taylor has waived the defense by actively participating in the litigation of this case. *Id*. There is no question that, despite the defective service of summons, Trooper Taylor has actively participated in this case, including by participating in scheduling conferences, engaging in written discovery, participating in more than ten depositions and retaining his own experts. In *Colebrook*, the defendant police officer filed an answer asserting the defense of a defect in service, but did not move for judgment based on the defect in service until nineteen months later. *Colebrook*, 2010 WL 4979072 at *3. During that time period, the defendant fully participated in fairly extensive discovery that spanned more than a year and also filed a counterclaim against the plaintiff. *Id*. The only explanation offered by defendant regarding why he delayed filing the motion to dismiss based on defective service until after discovery was that he did not want to raise the defect at first because it could have been easily cured within the 120-day period allowed by Rule 4 of the Federal Rules of Civil Procedure. *Id*. at *3-*4. Regardless, although he noted that it was an "extremely close" decision, Magistrate Judge Wehrman found that, although the defendant technically preserved the defense of the defect in service in his answer, his subsequent course of conduct constituted a waiver of the defense. *Id*.

In this case, despite never being served with a proper summons, Trooper Taylor filed his Answer asserting defective service as an affirmative defense on April 19, 2010 and has since actively

participated in litigating this case. However, one significant difference between this case and *Colebrook* is that, in *Colebrook*, the defendant filed a counterclaim against the plaintiff. Although Trooper Taylor has participated in this case despite never being served, no counterclaims have been filed. Thus, unlike *Colebrook*, the Court finds that Trooper Taylor's participation in the litigation of this case is not sufficient to constitute a waiver of his ability to rely on the insufficient service of process defense.

Even though Trooper Taylor has not waived the insufficient service of process defense, it does not necessarily follow that Plaintiffs' claims against him must be dismissed with prejudice, as requested by Trooper Taylor. Under Fed. R. Civ. Pro. 4(m), "[i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed. R. Civ. Pro. 4(m). Whether Plaintiffs have met their burden and established good cause is a matter of discretion. *Friedman*, 929 F.2d at 1157.

In this case, more than 120 days have passed since the filing of the Complaint and Trooper Taylor still has not been served in his individual capacity. Accordingly, under Rule 4(m), (a) Plaintiffs' Complaint must be dismissed without prejudice; (b) the Court must order that service be made, or, (c) if Plaintiffs show good cause, the time for service must be extended. However, as Plaintiffs were appointed co-administrators of King's estate on December 10, 2009, under KRS § 413.180, the statute of limitations on Plaintiffs' claims against Trooper Taylor expired on December 10, 2010. Thus, options (b) and (c) are essentially futile because, even if Plaintiffs are successfully able to effectuate service on Trooper Taylor, their claims against him are no longer viable. *See Petty*

*v. County of Franklin, Ohio*, 478 F.3d 341, 346 n. 3 (6th Cir. 2007)(noting that Rule 4(m)'s requirement of dismissal *without* prejudice is of little practical relevance where the statute of limitations has run, as, even if plaintiff is permitted to re-file his or her claim, it would be barred by the statute of limitations); *Friedman*, 929 F.2d at 1158 (dismissal of complaint without prejudice under the predecessor to Rule 4(m) was still warranted, regardless of fact that the statute of limitations had run on plaintiffs' claims, thus rendering plaintiff's action time-barred). For this reason, Trooper Taylor argues that the Court should dismiss Plaintiffs' claims with prejudice. However, the 1993 Advisory Committee Notes to Rule 4(m) specifically anticipate such a situation and explain that, under this provision, the court is authorized "to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown...Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action, or the defendant is evading service or conceals a defect in attempted service." Fed. R. Civ. Pro. 4(m), 1993 Advisory Committee's Note.

As noted above, granting relief in such circumstances is a matter of discretion. As the Sixth Circuit has previously observed, "counsel's inadvertent failure or half-hearted efforts to serve a defendant within the statutory period does not constitute good cause." *Friedman*, 929 F.2d at 1157. Factors other courts have considered in determining whether to exercise discretion to extend the time for service include: "(i) Plaintiff's failure to take action - or even make further inquiry - when notified of the asserted insufficiency defense claimed in [defendant's] answer; (ii) Plaintiff's failure to seek an extension of time to perfect service - even after [defendant] persisted in arguing his insufficiency defense in his summary judgment motion; and (iii) the absence of evidence that [defendant] evaded service or attempted to conceal a defect in service." *Melton v. Wiley*, 262

Fed.Appx. 921, 924 (11ᵗʰ Cir., Jan. 15, 2008)(unpublished). Each of these factors are also present in this case. In similar circumstances, another district court concluded that "[p]laintiff's predicament was of his own making" and denied plaintiff's request for an extension of time to perfect service, even though the statute of limitations would bar a refiled complaint. *Id.* The Eleventh Circuit affirmed and found that the district court had not abused its discretion in denying plaintiff's request for an extension. *Id.*

Here, Plaintiffs apparently failed to make any inquiry into Trooper Taylor's insufficient service of process defense; failed to file any motion to seek an extension of time to perfect service, even after Trooper Taylor filed his motion for summary judgment; and there is no evidence that Trooper Taylor has, at any time, evaded service or attempted to conceal the problems with service in this case. Given these circumstances, the Court finds that Plaintiffs have not shown good cause for the time for service to be extended, notwithstanding the expiration of the statute of limitations for Plaintiffs' claims. The Court further declines to exercise its discretion to grant such an extension, even in the absence of good cause. Although dismissals under Rule 4(m) are typically without prejudice, dismissal without prejudice would be meaningless here, as Plaintiffs' claims against Trooper Taylor are no longer viable. Accordingly, dismissal of Plaintiffs' claims against Trooper Taylor with prejudice is warranted, even without considering the merits of those claims. Thus, the Court grants Trooper Taylor's motion to the extent that it seeks dismissal of Plaintiffs' claims with prejudice based upon the insufficient service of process.

Even though the Court finds that dismissal of Plaintiffs' claims against Trooper Taylor is warranted on procedural grounds, as an alternative ground for its decision, the Court will also

consider whether summary judgment in Trooper Taylor's favor is appropriate on the merits of Plaintiffs' claims.

**B.    Merits of the Constitutional Claims Against Trooper Taylor**

1.    <u>Summary Judgment Standard</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. Indeed, "the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Chappell*

*v. City of Cleveland*, 585 F.3d 901, 906 (6ᵗʰ Cir. 2009). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

        2.    Qualified Immunity

Plaintiffs bring claims against Trooper Taylor under 42 U.S.C. § 1983 for violating King's Fourth Amendment rights to be free from unreasonable search and seizure. Specifically, Plaintiffs claim that Trooper Taylor's presence at his back door constitutes an unreasonable search and his shooting and killing of King constitutes an unreasonable seizure. [DE #1 at ¶ 18]. "Under § 1983, an individual may bring a private right of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes." *Bletz v. Gribble*, 641 F.3d 743, 749 (6ᵗʰ Cir. 2011).

Trooper Taylor argues that he is entitled to summary judgment on Plaintiffs' § 1983 claims on the basis of qualified immunity. A government official performing discretionary functions is entitled to qualified immunity in his individual capacity, and is, therefore, shielded from liability for civil damages, if his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Barber v. City of Salem, Ohio*, 953 F.2d 232, 236 (6ᵗʰ Cir. 1992). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009).

Such immunity is "'an expression of policy designed to aid in the effective functioning of government.'" *Scheuer v. Rhodes*, 416 U.S. 232, 242 (1974)(quoting *Barr v. Matteo*, 360 U.S. 564, 572-73 (1959)). The protection provided by qualified immunity covers mere mistakes in judgment and applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 129 S.Ct. at 815 (*quoting Groh v. Ramirez*, 540 U.S. 551, 567 (2004)(Kennedy, J., dissenting)).

In order to successfully assert the qualified immunity defense, an official must first demonstrate that he or she acted within their discretionary authority. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Once this showing is made, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established that any reasonable official in his or her position would have understood it was unlawful to engage in the conduct that violated the right. *Id.* Plaintiffs do not dispute that Trooper Taylor was acting within his authority as a police officer, so the burden then shifts to Plaintiffs to overcome the qualified immunity defense. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

In evaluating whether a defendant is entitled to qualified immunity, "the court makes two inquiries: (1) '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]' and (2) was the right 'clearly established' to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful." *Bletz*, 641 F.3d at 750 (*quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223)(alterations in *Bletz*).[2] The

---

[2]In *Pearson*, the United States Supreme Court relaxed *Saucier*'s requirement that the court must address these questions in order. *Pearson*, 129 S.Ct. at 818 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often

operative question "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201.[3]

Plaintiffs have alleged that Trooper Taylor violated King's Fourth Amendment Rights to be free from unreasonable search and seizure. The first step in evaluating whether Trooper Taylor is entitled to qualified immunity from Plaintiffs' claims is to evaluate whether the facts alleged, when viewed in the light most favorable to Plaintiffs, show that Trooper Taylor's conduct violated King's Fourth Amendment rights. If so, the Court will then examine whether those rights were clearly established to the extent that a reasonable person in Trooper Taylor's position would know that his conduct was unlawful.

### a.    Plaintiffs' Excessive Force Claim

With respect to Plaintiffs' claim that Trooper Taylor's shooting of King constituted an unreasonable seizure in violation of the Fourth Amendment, the Sixth Circuit has recently quoted

---

appropriate, it should no longer be mandatory.").

[3]In a pre-*Saucier* en banc decision, the Sixth Circuit added a third prong to this inquiry and held that, if the constitutional right at issue was clearly established, the court should then "determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999). While some panels of the Sixth Circuit have continued to apply this three step analysis of qualified immunity claims even after *Saucier*, others have acknowledged *Saucier* as binding and declined to do so. *See Dunnigan v. Noble*, 390 F.3d 486, 491 at n.6 (6th Cir. 2004)(discussing the split amongst the various Sixth Circuit panels and declining to apply the third step of the analysis required by *Williams*). However, as explained more fully below, Plaintiffs' excessive force claim "requires a showing that [Trooper Taylor's] use of deadly force was objectively unreasonable." *Chappell*, 585 F.3d at 908. Thus, even if not required by *Saucier*, in this case, the objective reasonableness of Trooper Taylor's actions must still be evaluated as part of Plaintiffs' excessive force claim against Trooper Taylor.

with approval this summary of the general legal standards to be used in evaluating a § 1983 excessive force claim:

> It is axiomatic that individuals have a constitutional right not to be subjected to excessive force during an arrest, investigatory stop, or other "seizure" of his person. *Graham v. Connor*, 490 U.S. 386, 388, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A claim that the government used excessive force during the course of a seizure is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Id.* In *Graham*, the Supreme Court established the test for analyzing objective reasonableness:
>
>> Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.
>
> *Id.* at 396, 109 S.Ct. 1865. Application of this test "requires careful attention to the facts and circumstances of each particular case, including the [1] severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Further, the "reasonableness" of a particular use of force is objective and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, and "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation," *id.* at 397, 109 S.Ct. 1865. Indeed, it is not for the Court to substitute its own notion of the "proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*, 215 F.3d 594, 602 (6th Cir. 2000). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.
>
> Moreover, with regard to the constitutionality of an officer's use of deadly force, which also is subject to the objective reasonableness standard of the Fourth Amendment, the Supreme Court has noted that the use of deadly force is reasonable only if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 7, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *see Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir.2005)(stating that "only in rare instances may an officer seize a suspect by use of deadly force"); *see also Williams v. City of Grosse Pointe Park*, 496 F.3d

482, 487 (6th Cir.2007)("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public.").

*Id*. at 908.

Thus, whether or not Trooper Taylor is entitled to qualified immunity on Plaintiffs' excessive force claims turns on whether the use of deadly force in the circumstances was objectively reasonable. Critical to this inquiry is whether Trooper Taylor had probable cause to believe that King posed a threat of serious physical harm, either to Trooper Taylor or others.

In this case, it is undisputed that the officers, including Trooper Taylor, had been warned that King was prone to violence and that he had previously shot at law enforcement officers. In addition, the officers were attempting to serve an EPO and arrest warrant on King that were issued as a result of King's violent behavior toward Linda Deskins and her brother. Moreover, according to the officers at the scene, Trooper Taylor shot King only after King sat up on the couch and pointed a gun toward the officers on his back porch. In such circumstances, Trooper Taylor would have probable cause to believe that King posed a threat of serious physical harm or death to Trooper Taylor and the other officers and he would, without question, be entitled to qualified immunity. *See, e.g., Estate of Sowards v. City of Trenton*, 125 Fed.Appx. 31, 38 (6th Cir., Feb. 24, 2005)(unpublished)(officers' use of deadly force objectively reasonable as a matter of law where the deceased had threatened the officers with a gun at close range). However, as this is before the Court on Trooper Taylor's motion for summary judgment, in evaluating the reasonableness of Trooper Taylor's use of deadly force, the Court must view the facts in the light most favorable to Plaintiffs, not Trooper Taylor. On the other hand, "[t]he court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence."

*Chappell*, 585 F.3d at 906 (citations omitted). Rather, in order to defeat Trooper Taylor's claim of qualified immunity, Plaintiffs cannot rely on conclusory allegations but must instead present significant probative evidence demonstrating a genuine issue of material fact for trial.

Plaintiffs argue that, taken in the light most favorable to them, Trooper Taylor "shot King while he was lying on his couch (possibly sleeping) from his back porch." [DE #33]. However, Plaintiffs' speculation that King may have been sleeping at the time he was shot is just that - speculation - and is insufficient to create a genuine issue of material fact defeating Trooper Taylor's motion for summary judgment.

Plaintiffs further argue that there is a genuine issue of material fact regarding whether King was pointing his gun at the officers when he was fatally shot. Plaintiffs first rely on pictures taken of King's body after the shooting, which show King on the couch, lying on his back with a gunshot wound to the right side of his face, a blanket covering the lower half of his body and a revolver in his right hand, resting on his right hip. His hand is over the grip of the gun. Plaintiffs point out that, in the picture, King's finger is not on the trigger. Although this is true, his thumb is very near the hammer and his index and middle fingers are very near the trigger. Thus, on their own, the pictures do not refute that King was threatening the officers with his gun at the time he was shot. In fact, given that King's thumb is near the hammer and his fingers are near the trigger, the pictures actually support the officers' version of the events.

Next, because Plaintiffs have no eyewitness testimony on which they are able to rely, as all of the eyewitnesses consistently testified that King was pointing his gun at the officers when he was shot, Plaintiffs rely on the expert testimony of two forensic pathologists, Dr. Gregory Davis and Dr. Robert Pfalzgraf. Dr. Pfalzgraf and Dr. Davis both opined that, once King was shot, he no longer

had the ability to make purposeful movements and died either instantaneously or within seconds.

Plaintiffs state that Dr. Davis "testified that it would be impossible for King to get shot while sitting

up and facing the shooter, with his feet on the floor, turn sideways, place his legs on the couch and

then cover himself up." [DE #33]. Plaintiffs further represent that Dr. Davis "testified that it is more

likely that King was shot in the lying position (on the couch) versus the testimony of the officers that

he was sitting up and spinning a weapon towards Isaacs." [*Id.*].

> Dr. Pfalzgraf, the Plaintiffs' expert, also made the following conclusions in an affidavit:
>
> It is my testimony, within a reasonable degree of medical certainty, that at the time of the shooting it is highly unlikely that Mr. King's right arm was extended toward the officers at the time of injury. This is due to the fact that post death his arm was found to be on his hip/waist area and once the bullet perforated his medulla oblongata, he would have become unresponsive and flaccid immediately.
>
> It is also my testimony that Mr. King's head was facing the end of the couch or television at the time of his injury.
>
> [DE #33-2].[4]

Dr. Pfalzgraf's report also noted that "the gunshot wound of entrance was in Mr. King's right

cheek, and the wound track traveled from front to back and right to left." [DE #33-5]. Dr. Pfalzgraf

concluded that "the direction of the wound track is inconsistent with Mr. King facing Deputy Isaacs,

because if his head was turned toward Deputy Isaacs, the wound track would have been front to back

and left to right. Since the wound track also traveled slightly below to above, the shooter would have

been either slightly lower than Mr. King or Mr. King's head had to be tilted backwards." [DE #33-5].

---

[4]Dr. Davis disagreed with Dr. Pfalzgraf's conclusions regarding whether King had his right arm extended toward the officers at the time of the shooting and testified that Dr. Pfalzgraf was going "too far" and that his statement could not be made based upon the findings regarding the wound tracks or the photographs. [DE #33-16].

Plaintiffs argue that the expert testimony supporting that King's feet were on the couch, not on the floor, and that he was lying back, not sitting up, when he was shot create a genuine issue of material fact regarding whether King was threatening the officers with his gun. In making this argument, Plaintiffs represent that the officers testified that King's feet were planted on the floor when he was shot.[5] Whether or not Plaintiffs' characterization of the officers' testimony is correct, Plaintiffs then attempt to contrast the testimony of the officers with the conclusions of the experts and argue that a genuine issue of material fact is present regarding whether King was sitting up or lying down when he was shot and, accordingly, Trooper Taylor should not be granted summary judgment.

However, even if the pictures of King's body and the expert testimony do create an issue of fact with respect to the position of King's body, only disputes of *material* facts, or facts that might affect the outcome of the suit under the governing law, will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The substantive law governing the case identifies which facts are critical and which

---

[5]Contrary to Plaintiffs' representations, the officers' did not testify that King's feet were on the floor when he was shot. Rather, their testimony was, at best, inconclusive. With respect to King's feet positioning, Deputy Adams first stated, "If I recall correctly, I believe he had placed his feet out, like, one foot out on the floor, possibly both feet. I'm not sure." [DE #31-2]. However, when he was later asked about the placement of King's feet and his body posture, he states that he honestly didn't know and that, "Again, I'm having to speculate on that, because I cannot recall actually where his legs were at the time." [*Id.*]. Similarly, Trooper Taylor's testimony was also inconclusive regarding the placement of King's feet. Trooper Taylor testified that King was sitting up and that it "appeared" to him that King's feet were on the floor and that he "believed" that is where they were, but he also repeatedly testified that he kept his focus only on King's hands in order to assess whether King posed a threat. [DE #31-1]. The only conclusive testimony regarding the position of King's feet was from Deputy Isaacs, who stated that he was positive that King's feet were not planted on the floor at the time he was shot. [DE #31-3]. Thus, Plaintiffs' repeated criticism of the "inconsistencies" between the officers' testimony is unwarranted.

facts are irrelevant. *Id*. Here, the critical fact is whether King was threatening the officers with his gun, such that Trooper Taylor reasonably believed that King posed a threat of serious physical harm to Trooper Taylor or others. *Garner*, 471 U.S. at 11-12. Thus, whether King's feet were on the couch or on the floor, or whether he was lying down or sitting up, is not relevant, as neither fact refutes the officers' testimony that King was threatening the officers with his gun by pointing it toward them.

In addition, Plaintiffs' efforts to use Dr. Davis's testimony to bolster their argument that King was actually lying down at the time he was shot is also misleading. In fact, the question presented to Dr. Davis by Plaintiffs' counsel was whether the position of King's body in the photographs taken after he was killed "would be more consistent with being shot in that same position, *than it would be his feet on the floor and then flopping back...onto the couch*." Although Dr. Davis agreed that this seemed more likely, he clarified that, "Well, again, I don't know. People who are hit with high-powered weapons, their bodies can be flung. I can't rule out him being seated. I can't rule out somebody moving the body that we just don't know about. And I certainly...And I certainly can't rule about – rule out him being in that lying position with either the firearm extended towards Trooper Taylor, or not extended towards Trooper Taylor. Again, that's not something I can comment on." [DE #33-16]. Notably, Dr. Davis was responding to a compound question. Thus, contrary to Plaintiffs' representations, Dr. Davis was not agreeing with Plaintiffs' counsel that it was more likely that King was lying on the couch instead of sitting up when he was shot. Rather, Dr. Davis agreed that it was more likely that King was shot with his feet on the couch, rather than with his feet on the floor and then flopping back on the couch. In fact, Dr. Davis specifically testified that he could not rule out that King was sitting up when he was shot, particularly given that King was shot with a high-

powered rifle. Thus, at best, Dr. Davis's testimony is inconclusive with respect to whether King was seated when he was shot. Such inconclusive testimony is certainly not enough evidence on which the jury could reasonably find for Plaintiffs on this issue. It is also not significantly credible to rebut the testimony of the officers and create more than some "metaphysical doubt" as to the material facts. Accordingly, Plaintiffs' reliance on Dr. Davis's testimony is misplaced. As this is the only evidence cited by Plaintiffs in support of their conclusion that King was lying down when he was shot, Plaintiffs' conclusion is also mere speculation.[6]

Plaintiffs' reliance on Dr. Pfalzgraf's opinions is also problematic. Plaintiffs' rely on Dr. Pfalzgraf's conclusion that King's head was facing "the end of the couch or towards the television" and not toward Deputy Isaacs. [DE #33]. Although Plaintiffs' further state that Dr. Pfalzgraf concluded that King's head was tilted backwards when he was shot, Dr. Pfalzgraf's full conclusion was that "[s]ince the wound track also traveled slightly below to above, the shooter would have been either slightly lower than Mr. King *or* Mr. King's head had to be tilted backwards." [DE #33-5] (emphasis added). Regardless, even if King was not facing the officers, this is not sufficient to refute the officers' testimony that King was pointing his gun toward them. Obviously, shootings happen very quickly, so it is entirely possible that King looked away immediately before he was shot. Whether King was facing the officers at the precise moment that he was shot is not significant enough to create a genuine issue of material fact regarding whether King was threatening the officers

---

[6]Notably, Dr. Pfalzgraf, Plaintiffs' expert witness, concluded that "[n]ot enough information is available to determine whether Mr. King was lying down or sitting up on the couch at the time he was shot." [DE #33-4]. Although he also noted in his initial report that "[e]xact positioning of the shooter may help elucidate this aspect further," his later report concluded only that the shooter "would have been either slightly lower than Mr. King or Mr. King's head had to be tilted backwards," and did not provide any further definitive conclusions regarding whether King was sitting or lying down at the time he was shot. [DE #33-4, 33-5].

with his gun in the moments before the shooting, as has been consistently maintained by the only eyewitnesses. *See Leong v. City of Detroit*, 151 F.Supp.2d 858, 865-866 (E.D. Mich. 2001)(holding that forensic evidence contradicting the officers' testimony that a suspect was facing towards them when he was shot did not defeat that officers' motion for summary judgment on qualified immunity grounds, noting that there is no "bright line rule" that a suspect, though armed, does not pose a significant threat of death or serious physical injury to an officer or others as long as he is facing away from the officer, particularly given that "[p]lainly, an armed and gun-wielding suspect can turn and train his weapon on an officer or bystander in an instant, with disastrous consequences."). Indeed, placing too much significance into the exact position of King's head immediately prior to the shooting in determining whether Trooper Taylor acted reasonably ignores the very facts that this Court is required to consider: that these were tense, uncertain, and rapidly evolving circumstances that required a split-second judgment by Trooper Taylor. *Graham*, 490 U.S. at 396–97.

The only evidence relied on by Plaintiffs relevant to whether King was pointing his gun towards the officers and, accordingly, whether Trooper Taylor had probable cause to believe that King posed a threat of serious physical harm to Trooper Taylor or others, is Dr. Pfalzgraf's conclusion that "within a reasonable degree of medical certainty it is unlikely that King had his arm extended towards the officers at the time of injury, due to the fact that post death his arm was found to be on his hip/waist area and once the bullet perforated his medulla oblongata, he would have become unresponsive and flaccid immediately." [DE #33]. Dr. Pfalzgraf does not elaborate on why the fact that King would have become unresponsive and flaccid immediately precludes the possibility that his arm was extended towards the officers at the time he was shot, nor does he provide any other basis supporting his conclusion that King's arm was not extended towards the officers.

However, the presence of opposing experts is not a "free pass" to trial every time a conflict of fact is based on expert testimony. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 543-544 (6th Cir. 1999)(citing *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)). In order to defeat a motion for summary judgment an expert opinion" must be more than a conclusory assertion about ultimate legal issues." *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 663-664 (6th Cir. 2005)(citations omitted). Indeed, "[t]he evidentiary rules regarding expert testimony at trial were not intended to make summary judgment impossible whenever a party has produced an expert to support its position." 33A Fed. Proc., L. Ed. § 80:262. Thus, expert reports and affidavits that are entirely conclusory, are unsupported by any specific data, and are premised on unsupportable factual assertions are insufficient to create a genuine issue of material fact. *Williams*, 187 F.3d at 543. With respect to the sufficiency of an expert opinion, the Sixth Circuit has further explained that "an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard*, 432 F.3d at 664 (quoting *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579-80 (11th Cir.1985)). "Thus, '[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" *Id.* (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir.1989)).

Here, Dr. Pfalzgraf states that his conclusion regarding whether King's arm was extended is based on the placement of his arm post-death and his conclusion that King would have become unresponsive and flaccid immediately after being shot. In *Eggerson v. Hessler*, 2007 WL 579545 (6th Cir., Feb. 15, 2007)(unpublished), the court relied on *Williams* in rejecting an expert affidavit where "although [the expert] mechanically listed the facts he relied upon to make his conclusions, he did not reveal, even in a most basic sense, the 'process of reasoning' or 'inferential process' he

relied on in making his conclusions." *Id*. at *3. In this case, although Dr. Pfalzgraf lists the facts that he relied upon in making his conclusion, he failed to elaborate on how his conclusion followed from these facts. Thus, as in *Eggerson*, he failed to reveal his process of reasoning or inferential process that he relied upon. Indeed, Dr. Pfalzgraf's bare-bones conclusions fail to offer any explanation regarding how the placement of King's arm and the fact that he would have become immediately unresponsive after he was shot precludes the officers' testimony that King was pointing his gun at them when he was shot. Significantly, King was shot with a high-powered rifle. Thus, determining whether King was pointing a gun towards the officers when he was shot requires more than just looking at the placement of King's arm after he was shot, as additional factors, such as the fact that the body could be flung from the force of the bullet, must also be taken into account. However, Dr. Pfalzgraf's opinion provides no explanation of such things as the effect of the physical impact of the bullet. Instead, Dr. Pfalzgraf's opinion essentially states that, based only on the position of the body after King was killed, he could determine the position of his arm immediately prior. It is simply a conclusion with no reasoning. Thus, there is no connection between the physical evidence cited by Dr. Pfalzgraf and his conclusion. As this conclusory opinion is the only evidence offered by Plaintiff with respect to whether King was pointing his gun at the officers when he was shot, King has failed to create a genuine issue of material fact with respect to this issue. *See Brainard*, 432 F.3d at 664 (district court acted well within its discretion by discarding expert affidavit that employed broad and dramatic language without meaningful analysis or reasoning).

Plaintiffs rely on the Sixth Circuit's decisions in two other excessive use of deadly force cases, *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989) and *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), to argue that Dr. Pfalzgraf's affidavit is sufficient to create a genuine issue of

material fact. However, these cases are distinguishable. In *Brandenburg*, although the officers maintained that Brandenburg had pointed his weapon at them, the court noted that even the *officers'* expert "testified that the position of the body after death indicated that the right hand was not grasping the trigger and that the position of the left arm could not prove that Mr. Brandenburg was aiming his weapon at the officers." *Brandenburg*, 882 F.2d at 215. Thus, there was actual physical evidence that Brandenburg did not have his finger on the trigger of the gun and was not aiming it at the officers when he was shot. In contrast, in this case, Plaintiffs have pointed to no such physical proof contradicting the officers' testimony that King was pointing his gun towards them. Although Dr. Pfalzgraf concludes that King's body position indicates that he was not, as noted above, he does not provide any explanation at all of the inferential process he relied on to connect King's body position and his conclusion that King's arm was not extended towards the officers when he died. Without this connection, Dr. Pfalzgraf's conclusion remains unsupported and is insufficient to create a genuine issue regarding whether King was pointing his gun towards the officers.

*Dickerson* is also distinguishable. In *Dickerson*, there was contradicting testimony from both a police officer at the scene and a neighbor regarding whether Dickerson was pointing a gun at an officer when he was shot and killed. *Dickerson*, 101 F.3d at 1163. However, in this case, there is no contradicting testimony. Rather, the only eyewitnesses to the shooting were Trooper Taylor, Deputy Adams and Deputy Isaacs and each has *consistently* testified that King was pointing his gun towards them when he was shot. Although not necessary to the Court's decision herein, the Court has carefully reviewed the deposition testimony submitted by the parties and finds that the officers' testimony on whether King was threatening the officers with his gun when he was shot is particularly credible. In fact, both Deputy Adams and Deputy Isaacs credit Trooper Taylor with saving their

lives. [DE #32-2, 32-3]. Regardless, unlike *Dickerson*, here there is no eyewitness testimony to refute the officers' position that King was threatening them with his gun. Dr. Pfalzgraf's unsupported, unexplained, conclusory opinion that King's arm was not extended when he was shot is simply insufficient to create a genuine issue of fact to the contrary.

Accordingly, Plaintiffs have failed to present evidence creating a genuine issue of material fact with respect to whether King was pointing his gun at the officers and, thus, whether Trooper Taylor had probable cause to believe that King posed a threat of serious physical harm, either to Trooper Taylor or others. Given that Trooper Taylor knew that King was violent, particularly toward law enforcement, and that King was pointing a gun at Trooper Taylor and Deputies Adams and Isaacs, the Court finds that Trooper Taylor had probable cause to believe that King posed such a threat. Thus, Trooper Taylor's use of deadly force under the circumstances was objectively reasonable. For these reasons, taken in the light most favorable to Plaintiffs, the facts do not show that Trooper Taylor's conduct violated King's Fourth Amendment rights in connection with Plaintiffs' excessive force/unreasonable seizure claim. Thus, Trooper Taylor is entitled to qualified immunity on this claim.

As the Court finds that there is no Fourth Amendment violation, it is unnecessary to analyze whether King's Fourth Amendment rights were "clearly established" to the extent that a reasonable person in Trooper Taylor's position would know that his conduct was unlawful.

(1)     Evidence Regarding Trooper Taylor's Subjective Intent

Plaintiff argues that comments made by Trooper Taylor to dispatch prior to the shooting demonstrate that Trooper Taylor may have had an improper motive and suggest that Trooper Taylor may have been predisposed to shooting King even before arriving at King's property. For example,

Trooper Taylor commented to dispatch that he had told Trooper Thornberry that "there shouldn't be no EPO on that guy" because "you don't serve an EPO on dead people." [DE #33-13]. In his deposition, Trooper Taylor later explained that he was referring to the prior incident in which he was told that King had fired shots at other state troopers and that he meant that, generally, "when people shoot at a Kentucky State Trooper, because of our training, and we – we neutralize the threat, they generally don't live." [*Id.*].

In addition, in a later conversation between Trooper Taylor and dispatch prior to the shooting, the following exchange occurred:

> Trooper Taylor: So, either he'll be home (a); (b) he'll be home and come out shooting, you know; or (c) he'll come out, and – yeah, and one of us will have to kill – shoot him.

> Dispatch: Well, um –

> Trooper Taylor: If I did, I don't care to be off. I'll be off until after the first of the year.

> Dispatch: Well, you make sure – you make sure you hit your 97 button when you go 97; and you make sure you key your repeater so I can get a hold of you, you hear me?

> Trooper Taylor: Well, if you don't get a hold of me, then it may be I'm busy shooting bullets or something.

> Dispatch: No, that's not the right answer, Eric.

> Trooper Taylor: Yeah, that's one of them –

> Dispatch: Eric.

> Trooper Taylor: Just let – Just let the dispatcher holler and let –

> Dispatch: Eric, don't you dare.

> Trooper Taylor: Yeah. Yeah, you ain't got time to talk on the radio.

Dispatch: I'm gonna to come over there and –

Trooper Taylor: That's – That's a Lexington Metro –

Dispatch: – beat your – beat you to a pulp.

Trooper Taylor: That's a Lexington – or, Louisville Metro thing there, we – we deal with stuff, you know, we say, Richmond, I've had this pursuit and I had to shoot this guy, –

Dispatch: Oh, –

Trooper Taylor: – after it's over.

Dispatch: Eric, I would shoot you.

Trooper Taylor: Yeah, baby. You would, wouldn't you?

Dispatch: Yeah, right. Exactly.

Trooper Taylor: Yeah, I've done that before. Richmond – (unintelligible) or something, I had a short pursuit there, and then –

[*Id.*].

However, the Fourth Amendment reasonableness analysis is an objective inquiry in which the court asks whether "the circumstances, viewed objectively, justify [the challenged] action." *Ashcroft v. Al-Kidd*, – U.S. –, 131 S.Ct. 2074, 2080 (2011)(*quoting Scott v. United States*, 436 U.S. 128, 138 (1978)(alterations in original). "If so, that action was reasonable "*whatever* the subjective intent" motivating the relevant officials." *Id.* (*quoting Whren v. United States*, 517 U.S. 806, 814 (1996)(emphasis in original)). Thus, Trooper Taylor's subjective intent is irrelevant to whether he is entitled to qualified immunity on Plaintiffs' Fourth Amendment Claims.

### b.        Plaintiffs' Unreasonable Search Claim

Plaintiffs also claim that Trooper Taylor's presence at King's back door constitutes an unreasonable search, thereby violating King's Fourth Amendment rights. "It is axiomatic that the physical entry of the home is the chief evil against which the working of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984). In addition, the Fourth Amendment not only protects individuals from illegal seizures in their homes; the right is also extended to the curtilage of the home "because individuals possess a reasonable expectation of privacy in the area surrounding and appurtenant to the home." *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598 (6th Cir. 1998).

Plaintiffs' claim hinges on their argument under *Payton v. New York*, 445 U.S. 573, 586 (1980), that "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. However, Plaintiffs' argument overlooks that it is undisputed that the officers *had* a warrant for King's arrest at the time they were at King's home. Plaintiffs' also overlook that *Payton* further provides that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id*. at 603. Thus, even viewing the facts in the light most favorable to Plaintiffs, there is no evidence to support a conclusion that Trooper Taylor's presence on King's back porch constituted a Fourth Amendment violation. Again, because the Court finds that there is no Fourth Amendment violation, it is unnecessary to analyze whether King's Fourth Amendment rights were "clearly established" to the extent that a reasonable person in Trooper Taylor's position would know that his conduct was

unlawful.  Thus, Trooper Taylor is entitled to qualified immunity on Plaintiffs' unreasonable search claim.

### C.    Plaintiffs' State Law Claims Against Trooper Taylor

1.    Assault and Battery

Plaintiffs also bring an assault and battery claim against Trooper Taylor under Kentucky state law for the shooting and killing of King.  Trooper Taylor moves for summary judgment on this claim under Kentucky's justification statutes.  Under Kentucky law, the use of physical force, including deadly physical force, by a defendant is justifiable "when the defendant believes that such force is necessary to protect himself against death, serious physical injury...[or] felony involving the use of force..."  KRS § 503.050(2).

In addition, KRS § 503.070(2) provides that the use of physical force, including deadly physical force, is justifiable when:

> (a) The defendant believes that such force is necessary to protect a third person against imminent death, serious physical injury..., or other felony involving the use of force...and
>
> (b) Under the circumstances as they actually exist, the person whom he seeks to protect would himself have been justified under KRS § 503.050 and 503.060 in using such protection.

KRS § 503.070.[7]

In this case, the undisputed evidence shows that Trooper Taylor knew that King had a propensity towards violence, he knew that King was being served with an EPO, and he knew that King had previously shot at law enforcement.  In addition, immediately prior to the shooting, King

---

[7]KRS § 503.060 provides the circumstances under which the use of physical force by a defendant upon another person is not justifiable, none of which are present here.

was threatening the officers with his gun by raising and pointing it in their direction. In these circumstances, there can be no question that Trooper Taylor was justified in believing that deadly force was necessary in order to protect himself and/or Deputies Adams and Isaacs from being shot and killed by King. Thus, his use of deadly force was justified under KRS §§ 503.050 and 503.070.

KRS §§ 503.085(1) provides, in part, that "[a] person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force, unless the person against whom the force was used is a peace officer, as defined in KRS § 446.010, who was acting in the performance of his or her official duties and the officer identified himself or herself in accordance with any applicable law, or the person using force knew or reasonably should have known that the person was a peace officer." KRS § 503.085(1). Thus, under this statute, Trooper Taylor is immune from civil action for his use of deadly force against King.

Plaintiffs do not specifically address Trooper Taylor's arguments that he is entitled to immunity from their state law claims under Kentucky's justification statutes. Rather, Plaintiffs generally reiterate all their previous arguments regarding their federal constitutional claims. However, none of these arguments refute that Trooper Taylor believed the use of deadly physical force was necessary to protect himself and others from death or serious physical injury. Accordingly, Trooper Taylor is entitled to summary judgment on Plaintiffs' state law assault and battery claim and any wrongful death claim.

2. Negligence

Plaintiffs' final claim against Trooper Taylor is that his negligent conduct was a substantial factor in bringing about King's death. Trooper Taylor moves for summary judgment on this claim

under the doctrine of qualified official immunity as set forth in *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001), as well as his argument that King's own criminal conduct was a superseding cause of King's death.

In Kentucky, qualified official immunity affords a public officer sued in their individual capacity "protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero*, 65 S.W.3d at 522 (citations omitted). "Qualified official immunity applies to the negligent performance by a public officer employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.* (citations omitted).

In *James v. Wilson*, 95 S.W.3d 875, 905 (Ky. Ct. App. 2002), the Kentucky Court of Appeals further explained the good faith requirement as follows:

> The good faith qualification to official immunity for discretionary acts was first recognized by this Court in *Thompson v. Huecker*, and the United States Supreme Court has concluded that the good faith component consists of both an objective and a subjective aspect. The objective component refers to the presumptive knowledge of and respect for unquestioned rights while the subjective component alludes to the presence of a malicious intent or corrupt motive. In the context of qualified official immunity, "bad faith" can be predicated on a violation of a "constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, i.e., objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." Once the officer or employee has presented a prima facie case establishing that the act performed was within the scope of his discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.

> *Id.* (citations omitted).

Finally, the Kentucky Supreme Court has recently further explained the plaintiff's burden with respect to the good faith requirement:

> Kentucky has recognized that part and parcel to the scheme of qualified official immunity is the notion that public officials will not be held liable for "'bad guesses in gray areas.'" *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky.2006)(quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). Accordingly, in order to charge liability, a complainant may not merely allege injury, but must point to "a causally related violation of a constitutional, statutory, or other clearly established right," *Sloas*, 201 S.W.3d at 475 (quoting *Yanero*, 65 S.W.3d at 523), or produce some proof that the action was not in "good faith," *Autry*, 219 S.W.3d at 717. There is often a clear distinction between proof of a negligent act and proof of any bad faith which prompted it.

> *Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 810 (Ky. 2009).

Plaintiffs do not dispute that Trooper Taylor's actions were within the scope of his discretionary authority. Thus, the burden shifts to Plaintiffs to establish by direct or circumstantial evidence that Trooper Taylor's actions were not in good faith. Here, Plaintiffs rely on their prior arguments that Trooper Taylor's actions violated King's clearly established constitutional rights and that these alleged constitutional violations show Trooper Taylor's bad faith. However, this Court has found that Trooper Taylor did not violate King's constitutional rights. Thus, Plaintiffs' reliance on their prior arguments as proof of Trooper Taylor's bad faith fails.

Plaintiffs further argue that Trooper Taylor's statements to dispatch before the shooting show that his actions "may have been premeditated." However, Trooper Taylor's comments do not reflect a "corrupt motive" or a "malicious intent" to shoot and kill King. Rather, Trooper Taylor's comments reflect that he was about to enter a very high-stress situation involving serving an arrest warrant on an individual who was known to be violent, known to possess guns, and known to have previously shot at law enforcement. Trooper Taylor never suggests that, for example, he intended

to shoot King no matter how King responded to the presence of law enforcement on his property or that he intended to shoot at King as revenge for King's prior attempt to shoot at law enforcement. Such comments may be indicative of a malicious intent and may show that Trooper Taylor acted in bad faith. Rather, Trooper Taylor's comments, while perhaps crude, acknowledge that he was aware that King was violent and could very well "come out shooting" at the police officers and that, if King did, Trooper Taylor was prepared to shoot him in response. This does not reflect a "corrupt motive" but instead reflects that Trooper Taylor was prepared to follow his training and respond to the threat of deadly force.

For these reasons, Trooper Taylor's comments to dispatch do not establish that he was not acting in good faith at the time he shot King. Accordingly, he is entitled to qualified official immunity under *Yanero* is further entitled to summary judgment in his favor on Plaintiffs' negligence claim. However, even if Trooper Taylor was not entitled to qualified official immunity, King's criminal actions of pointing a firearm at law enforcement officers supersedes any negligence on Trooper Taylor's part. Under Kentucky law, "a superseding cause relieves the original negligent actor from liability irrespective of whether the antecedent negligence was or was not a substantial factor in bringing about an injury." *Com., Dept. of Highways v. Graham*, 410 S.W.2d 619, 620 (Ky. 1966). Criminal conduct can constitute a superseding cause in negligence actions. *See Fryman v. Harrison*, 896 S.W.2d 908, 911 (Ky. 1995).

In this case, even if Trooper Taylor was somehow negligent, it was King's decision to threaten law enforcement officers with his gun, not any negligence by Trooper Taylor, that was the proximate cause of his death. Thus, even if Trooper Taylor were not entitled to qualified official immunity under *Yanero*, he would still be entitled to summary judgment on Plaintiffs' negligence

claim.  *See Whitlow v. City of Louisville*, 39 Fed. Appx. 297, 308 (6th Cir., July 1, 2002)(unpublished)(affirming summary judgment on negligence claim against police officers where any negligence on the part of the police officers in executing a warrant was superseded by plaintiff's decision to raise his gun and point it directly at an officer).

IV.  **Conclusion**

For the foregoing reasons, and the Court being fully and sufficiently advised, it is HEREBY ORDERED that:

(1)   Defendant's motion for summary judgment [DE #31] is GRANTED, and Plaintiffs' claims are DISMISSED WITH PREJUDICE;

(2)   the pretrial conference of July 28, 2011 and the trial of August 30, 2011, are SET ASIDE;

(3)   Plaintiffs' motions in limine [DE # 40, 43] and motion to exclude [DE # 51] are DENIED AS MOOT;

(4)   judgment in favor of Defendant will be entered contemporaneously with this Opinion & Order; and

(5)   this matter is DISMISSED and STRICKEN from the active docket.

This the 19th day of July, 2011.



**Signed By:**

**_Karl S. Forester_**  K S F

**United States Senior Judge**